**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| **Simon Dawson,** | **Case No. 1:25-cv-00852-PAB** |
| **Plaintiff,** | |
| **-vs-** | |
| | **JUDGE PAMELA A. BARKER** |
| **Brookfield Asset Management LLC, et al.** | |
| **Defendants.** | **MEMORANDUM OPINION & ORDER** |

Currently pending before the Court is Defendants Brookfield Asset Management LLC and Brookfield 401(K) Savings Plan Investment Committee's Motion to Dismiss. (Doc. No. 18.) Plaintiff filed an Opposition to Defendants' Motion to Dismiss on July 23, 2025, to which Defendants replied on August 6, 2025. (Doc. Nos. 19, 20.) For the following reasons, Defendants' Motion to Dismiss (Doc. No. 18) is GRANTED.

## I. Allegations in the Complaint

Plaintiff, on behalf of himself and a proposed class, brings this action pursuant to the Employment Retirement Income Security Act ("ERISA"). Specifically, Plaintiff alleges that Defendants Brookfield Asset Management, LLC ("Brookfield") and the Brookfield 401(k) Savings Plan Investment Committee (the "Committee," and together with Brookfield, "Defendants") "breached their fiduciary duties to Plaintiff and the Class when they: (1) selected and retained imprudent American Century Fund Target Date Funds (the 'American Century TDFs') when prudent, more suitable TDF 'meaningful benchmarks' were readily available at the beginning of and throughout the Class Period; and (2) failed to monitor fiduciaries responsible for Plan administration and management on the Committee regarding their selection and retention of the American Century

TDFs." (Doc. No. 1, ¶ 3.)  The following facts are alleged in Plaintiff's Class Action Complaint (the "Complaint").

### A.    Plaintiff is a participant in the Brookfield Plan

"The Brookfield Plan is a defined contribution employee pension benefit plan under 29 U.S.C. § 1002(2)(A) and § 1002(34)." (Doc. No. 1, ¶ 38.)  "Brookfield is the Plan sponsor under 29 U.S.C. § 1002(16)(B)." (*Id.* at ¶ 40.)  Brookfield "serves as the Plan Administrator" and as such, "is also a fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A)," and "has authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a)." According to Plaintiff, Brookfield "delegated fiduciary authority to the Committee." (*Id.* at ¶ 49.)  "The Plan's assets under management makes it among the largest plans in the United States" because it "maintained close to or over $1 billion in assets" and "has had more than 8,000 participants since 2019." (*Id.* at ¶ 50.)

Plaintiff "was a participant in the Plan" while he "was employed by Brookfield between 2021 and 2023." (*Id.* at ¶ 41.)  Among others, Plaintiff held the following two investments in the plan: the "American Century Retirement 2040 Trust Class III and th[e] American Century Retirement 2045 Trust Class III." (*Id.* at ¶ 42.)  According to Plaintiff, he "did not have knowledge of all material facts (including, among other things, regarding the imprudence (sic) selection, and maintenance of, the American Century TDFs) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed." (*Id.* at ¶ 45.)  Plaintiff "having never managed a large 401(k) Plan such as the Plan, lacked actual knowledge of prudent Plan investments or the prudent alternative investments available to the Plan." (*Id.* at ¶ 46.)  He "did not have actual knowledge of the specifics of Defendants' decision-making

2

processes with respect to the Plan (including Defendants' processes for maintaining and monitoring the Plan's investments) because this information is solely within the possession of Defendants prior to discovery." (*Id.*)

Based on Plaintiff's lack of direct knowledge as to how the Plan was managed, "Plaintiff has drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth [in the Complaint]." (*Id.*)

**B.     According to Plaintiff, the American Century TDFs were an imprudent investment**

"The American Century TDFs had been included as investment options in the Brookfield Plan for many years prior to the beginning of the Class Period." (*Id.* at ¶ 51.) "The Committee was responsible for crafting the Plan's investment lineup, as well as adding new funds and removing old funds, and could have chosen other target date fund families than the American Century TDFs at or any time before or after the beginning of the Class Period." (*Id.* at ¶ 52.) Defendants "selected the TDFs as the [qualified default investment alternative] for Plan participants' retirement savings and for company matching contributions." (*Id.* at ¶ 54.) "[U]nless participants affirmatively directed otherwise, Defendants automatically directed participants' savings into the American Century TDFs." (*Id.* at ¶ 54.) Based on this, "the American Century TDFs held more of the Plan's assets than any other investment option in the Plan throughout the Class Period, by a significant margin." (*Id.* at ¶ 55.) Plaintiff asserts that "[a]s a jumbo plan with hundreds of missions (sic) of dollars to invest in a target date fund, the Plan would have been able to choose virtually any available target date funds for the Plan by the start of the Class Period," but the "American Century Target Date Series are the only target date investing options in the Plan." (*Id.* at ¶¶ 56–57.)

Plaintiff alleges, however, that "[a]s a result of numerous defects in their fiduciary process,

the Plan Committee has not yet removed the American Century TDFs from the Plan as of the date of this Complaint, years later than they should have." (*Id.* at ¶ 52.)  Plaintiff asserts that he has "allege[d] several meaningful performance benchmarks" and that "American Century TDFs fell below each of them." (*Id.* at ¶ 60.)

### 1. According to Plaintiff, the American Century TDFs underperformed their own market benchmark

Plaintiff alleges that "[t]he American Century TDFs underperformed their own benchmark, the S&P Target Date index, before and during the Class Period." (*Id.* at ¶ 61.)  Plaintiff asserts that (1) "[f]or the three-year period ending on December 31, 2018, the American Century TDFs underperformed their S&P Benchmark" by 0.68% to 1%,  (2) [t]he same pattern of underperformance for the American Century TDFs continued after January 1, 2019" by 0.39% to 1.67%, and (3) "the underperformance of the American Century TDFs has become more severe since 2021" by 0.57% to 2.80%.  (*Id.* at ¶¶ 62–64.)[1]

### 2. According to Plaintiff, the American Century TDFs underperformed "Other Large TDFs" on the market

Plaintiff alleges that, in 2018, the largest TDF families in the market were the Vanguard Target Retirement Series, the Fidelity Freedom Series, the Capital American Target Date Retirement Series, the T. Rowe Price Retirement Series, the JPM SmartRetirement Series, the Nuveen Lifecycle Series, the BlackRock LifePath Index, the Principal LifeTime Series, the Nuveen Lifecycle Index Series, the American Century One Choice Series, the Fidelity Advisor Freedom Series, and the JPMorgan SmartRetirement Blend Series (the "Large TDF Comparator Funds"). (*Id.* at ¶ 65.)  "The

---

[1] Plaintiff includes several charts supporting his claims of underperformance in the Compliant.  These charts contain several metrics for why Plaintiff believes the American Century TDFs underperformed their alleged peers.  The Court has considered these figures in reaching its decision today, but the Court has not reproduced Plaintiff's charts in this Memorandum Opinion and Order.

Large TDF Comparator Funds were available to the Defendants to include as investment options for the Plan, and thousands of other ERISA plan fiduciaries selected these Large TDF Comparator Funds for their plans as well." (*Id.* at ¶ 68.)

Plaintiff alleges that "the American Century TDFs have also underperformed compared to the Large TDF Comparator Funds during the three-year period ending December 31, 2018, and since 2019 and 2021." (*Id.* at ¶ 66.)  Plaintiff alleges that the American Century TDFs underperformed the Large TDF Comparators (1) by 1.59% to 2.36% during the three-year period preceding December 31, 2018; (2) by 1.19% to 2.77% since January 1, 2019; and (3) by 0.89% to 2.73% since January 1, 2021. (*Id.*)

According to Plaintiff, "[a]ll of the Large TDF Comparator Funds had similar structure, objectives, strategy, and risk profile to the American Century TDFs, and all were designed to provide essentially the same type of investment experience to plan participants: 'a long-term investment strategy based on holding a mix of stocks, bonds and other investments (this mix is called an asset allocation) that automatically changes over time as the participant ages.'" (*Id.* at ¶ 67.) These TDF families "were, like the American Century TDFs, included in the 'Target Date' Morningstar category." (*Id.* at ¶ 70.)  Plaintiff claims that "[a]ny reasonably prudent fiduciary determining which target date funds to offer the Plan's participants was or should have been aware of the Large TDF Comparator Funds and should have compared the performance of the American Century TDFs to the performance of these comparator TDFs." (*Id.* at ¶ 69.)

> **3.  According to Plaintiff, the American Century TDFs underperformed other TDFs with the same Morningstar Categorization**

Plaintiff asserts that "Morningstar, the most well respected and accepted financial industry fund database has created the Morningstar Lifetime Moderate Index category as the index category

5

for target date funds." (*Id.* at ¶ 71.) "A Morningstar Category is assigned by placing funds into peer groups based on their underlying holdings." (*Id.* at ¶ 72.) "The underlying securities in each portfolio are the primary factor in [Morningstar's] analysis . . . . Funds are placed in a category based on their portfolio statistics and compositions over the past three years. Analysis of performance and other indicative facts are also considered." (*Id.*) Morningstar groups funds "into categories according to their actual investment style, not merely their stated investment objectives, nor their ability to generate a certain level of income." (*Id.* at ¶ 73.) "Morningstar normally allocates funds to categories on the basis of their portfolio holdings" and "[s]everal portfolios are taken into account to ensure that the fund´s real investment stance is taken into account." (*Id.*) According to Plaintiff, "Morningstar categories are more reliable than simply comparing fund prospectuses, because Morningstar is a third party providing neutral information." (*Id.* at ¶ 74.)

Plaintiff claims that "Morningstar is particularly meaningful here because the American Century target date funds use Morningstar data to provide publicly available information." (*Id.* at ¶ 75.) "For example, American Century's own dissemination of information explains that the Morningstar ratings for the 2045 vintage were only one star for the overall returns (out of 180 funds), three-year returns, five-year returns, and 10-year returns." (*Id.* at ¶ 76.)

Plaintiff compares the American Century TDFs to what he describes as the "Morningstar Comparator Funds." "The Morningstar Comparator Funds are grouped in the same Morningstar Category as the American Century Target Date Series." (*Id.* at ¶ 80.) The Morningstar Comparator Funds are comprised of the "T. Rowe Price Retirement Target Date A Series, the American Funds Target Date R6 Series, the Callan GlidePath® Target Date R6 Series, the MoA Clear Passage Target Date Series, the Natixis Target Date N Series, the Nuveen Lifecycle Target Date R6 Series and Voya

Target Date CIT Series."  (*Id.* at ¶ 79.)

Plaintiff alleges that "[a] closer look at the American Century Target Date Series and Morningstar Comparator Funds further demonstrate they had similar underlying investments and strategies."  (*Id.* at ¶ 81.) "The American Century Target Date Series and each of the Morningstar Comparator Funds are Large Cap Blend series, meaning their underlying holdings are a combination of active and passive investments."  (*Id.* at ¶ 82.)   And "[t]he American Century Target Date Series and all of the Morningstar Comparator Funds have a 'through' glidepath."  (*Id.* at ¶ 85.)[2]

Plaintiff alleges that "[t]he 2045 vintage is a good demonstration of the American Century Target Date Series and the Morningstar Comparator Funds' asset allocations because the target date is neither too close nor too distant."  (*Id.* at ¶ 87.)  According to Plaintiff, "[t]he asset allocation is sufficiently similar across all funds, where U.S. Equities are the largest percentage of holdings, non-U.S. equities range from 20.07-29.57% of holdings, and the remaining holding are Fixed Income (or bonds), Cash investments, and less than one percent of 'other' and 'not classified' investments."  (*Id.*)

Plaintiff asserts that "the American Century TDFs have been consistently underperforming for almost ten years, as they consistently failed to meet their own benchmark and numerous other TDF families had better performance over almost ten years."  (*Id.* at ¶ 86.)  Based on the charts included with the Complaint, Plaintiff alleges that "the American Century TDFs . . . consistently underperformed compared to the Morningstar Comparator Funds . . . in their Morningstar Categories and their Morningstar benchmarks . . . on a 3-year average basis."  (*Id.* at ¶ 90.)

Plaintiff further alleges:

---

[2] According to Plaintiff, "[g]lide paths in retirement funds come in two main types: 'to' and 'through.' 'To' glide paths reach their most conservative allocation at the target retirement date and stay there, while 'through' glide paths continue to adjust and become more conservative for several years after the retirement date."  (Doc. No. 1, ¶ 84 (quoting *Johnson v. Parker-Hannifin Corp.*, 122 F.4th 205 (6th Cir. 2024).)

- that (1) "in 2019, the 2030-2060 vintages of the American Century TDFs underperformed against the Morningstar Comparator Funds' corresponding vintages 36 out of 41 instances (88%)," (2) "[i]n 2021, the same vintages underperformed against the Morningstar Comparator Funds' corresponding vintages in all 49 instances (100%)," and (3) "[i]n 2023 and 2024, the 2030-2065 vintages of the American Century TDFs underperformed against the Morningstar Comparator Funds' corresponding vintages in all 55 instances (100%), and in all 56 instances (100%), respectively, and (4) "[i]n total and since 2017, the American Century TDFs underperformed the Morningstar Comparator Funds on a 3-year lookback period in 196 out of 201 instances, or **98%** of the time." (*Id.*)

- that (1) "in 2019, the 2030-2060 vintages of the American Century TDFs underperformed against the Morningstar Comparator Funds' corresponding vintages 35 out of 35 instances (100%)," (2) "[i]n 2021, the same vintages underperformed against the Morningstar Comparator Funds' corresponding vintages in 39 out of 41 instances (95%)," (3) "[i]n 2023 and 2024, the same vintages underperformed against the Morningstar Comparator Funds' corresponding vintages in all 49 instances (100%)," (4) "[i]n total, and since 2015, the American Century TDFs underperformed the Morningstar Comparator Funds on a 5-year lookback period in 172 out of 174 instances, or **99%** of the time," and (5) "2030-2060 vintages of the American Century TDFs underperformed against the Morningstar benchmarks on a 5-year average basis in every instance in 2019, four out of seven instances in 2021, three out of seven instances in 2023, and three out of seven instances in 2024." (*Id.* at ¶¶ 92–93.)

- that "the American Century Target Date Series continuously ranked poorly as compared to its peers in its Morningstar Category on a 3-year average basis since before and throughout the Class Period." (*Id.* at ¶ 94.)

- that "[t]he American Century Target Date Series also continuously ranked poorly as compared to its peers in its Morningstar Category on a 5-year average basis since before and throughout the Class Period." (*Id.* at ¶ 95.)

- that "starting in 2019, the 2030-2065 vintages of the American Century TDFs underperformed against each of the Morningstar Comparator Funds' corresponding vintages on a one-year cumulative return basis in 211 out of 216 instances, or 98% of the time, [and] underperformed the Morningstar benchmarks in 28 out of 31 instances." (*Id.* at ¶ 96.)[3]

To support these allegations, Plaintiff included several charts comparing the American

Century TDFs' performance to the Morningstar Comparator Funds' performance on a one-, three-,

---

[3] Plaintiff omitted data from 2020 and 2022 when making this allegation.

and five-year basis.  Based on these charts, and Plaintiff's allegations, the American Century TDFs did at times outperform the Morningstar Comparator Funds.  Excluding those instances, based on the one-year performance data alleged in the Complaint, the range of outperformance generally was between 2% and 5%, with some outliers as low as less than 1% and as high as 7.66%.  (Doc. No. 1, ¶ 96; Appendix A.[4])  Based on the three-year annualized performance data alleged in the Complaint, the range of outperformance generally was between less than 1% and 3% and never exceeded 4%.  (Doc. No. 1, ¶ 90; Appendix B.[5])  Based on the three-year annualized performance data alleged in the Complaint, the range of outperformance generally was between less than 1% and 2%, and there were only two instances of outperformance of an amount higher than 3%.  (Doc. No. 1, ¶ 92; Appendix C.[6])

Based on this data, Plaintiff concludes that "that the American Century TDFs underperformed in both good markets and bad markets."  (*Id.* at ¶ 97.)  Plaintiff asserts that "[l]ooking at this data together, the American Century TDFs underperformed across several metrics for years before the Class Period, and for years into the Class Period."  (*Id.* at ¶ 98.)  "This consistent underperformance data was publicly available to the Committee at the time of their decision-making, whether they reviewed the funds annually or quarterly (if at all)."  (*Id.*)  According to Plaintiff "[p]rudent fiduciaries would have acknowledged that this pattern of underperformance did not bode well for the American

---

[4] The Court has summarized the charts included in Paragraph 96 of the Complaint concerning the one-year cumulative performance data in the Complaint into one chart in Appendix A.  Appendix A shows the range of alleged underperformance by year and by fund.

[5] The Court has summarized the charts included in Paragraph 90 of the Complaint concerning the three-year annualized performance data in the Complaint into one chart in Appendix B.  Appendix B shows the range of alleged underperformance by each three-year period and by fund.

[6] The Court has summarized the charts included in Paragraph 92 of the Complaint concerning the five-year annualized performance data in the Complaint into one chart in Appendix C.  Appendix C shows the range of alleged underperformance by each five-year period and by fund.

9

Century TDFs' future performance and would have made a timely switch to any of the numerous safer, better managed, and ultimately more optimistic investment options." (*Id.*)  Plaintiff concludes that "[g]iven the long history of underperformance, it's inexplicable why the American Century TDFs would have been included as Plan investment options by the start of the Class Period and kept in place."  (*Id.* at ¶ 99.)

### 4. According to Plaintiff, the American Century TDFs' poor performance has led to declining market share compared to other TDF families

Plaintiff alleges that "the market has taken note of the American Century TDFs' underperformance." (*Id.* at ¶ 100.)  "In 2016, the American Century TDFs had a roughly 1.5% market share among TDFs," but "[b]y the end of 2024, that market share had dwindled to 0.5%, or roughly 1/3 of its 2016 market share." (*Id.*)  According to Plaintiff, "while the industry as a whole has seen nearly 100% growth (excluding investment returns), American Century has seen a nearly 40% decline in assets as a result of redemptions."  (*Id.* at ¶ 101.)

### C. Plaintiff alleges that the American Century TDFs had significantly above average turnover rates

Plaintiff alleges that "[t]he American Century TDFs had significant turnover, however, much higher than 30%, both before and during the Class Period." (*Id.* at ¶ 106.)[7]  "During the period 2016-2018, the funds underlying the American Century TDFs had an average turnover of 68% per year, which rose to 72% per year over 2019-2023, more than double 30% starting in 2016, and substantially higher than the turnover for peer TDFs."  (*Id.* at ¶ 107.)  According to Plaintiff, "[a] turnover rate above 30% 'warrants closer inspection' by investment professionals."  (*Id.* at ¶ 105.)  Thus, Plaintiff

---

[7] "Turnover rates measure how often a fund changes its investments, with higher rates meaning the fund frequently buys and sells stocks or bonds." (Doc. No. 1, ¶ 102.)  "High turnover rates create meaningful transaction costs for funds." (*Id.* at ¶ 103.)  "A higher-than-average turnover rate may indicate an investment manager's lack of experience or an attempt to mask a fund's underperformance."  (*Id.* at ¶ 104.)

claims that "the American Century TDF's turnover was a significant red flag, and a prudent fiduciary would have investigated the reasons for the high turnover and the impact the turnover was having on the Plan and the participants' retirement savings." (*Id.* at ¶ 109.)

"Taken together, because of the underperformance and high turnover rates for the American Century TDFs, Defendants were or should have been aware from the beginning of the Class Period that the American Century TDFs were not an appropriate investment in the Plan." (*Id.* at ¶ 110.) Plaintiff asserts that the allegations in the Complaint "in no way uses hindsight," and instead "is solely based on information that Brookfield and the Committee had or should have had available to them." (*Id.* at ¶ 111.)

### D.    Defendants' alleged imprudence caused harm to Plaintiff

"By failing to engage in an objectively reasonable fiduciary process when retaining and failing to remove American Century TDFs from January 2019 until January 2025, Defendants breached their fiduciary duties of prudence to Plaintiff and Plan participants and are liable to Plaintiff and Class Members for the retirement monies lost through the imprudent investment in the American Century TDFs through the Class Period." (*Id.* at ¶ 113.) "Defendants caused objectively unreasonable losses to Plaintiff and the Plan's participants of more than $31 million from the beginning of the Class Period, when considering the retirement losses suffered by Plaintiff and the Class by the Plan Committee maintaining various versions of the American Century TDFs as the Plan's default investment." (*Id.* at ¶ 114.)

## II.    Procedural History

Plaintiff filed this action on April 29, 2025 by filing his Complaint. (Doc. No. 1.) Therein, Plaintiff brings two claims for relief: (1) "Breach of Duty of Prudence of ERISA, as Amended," and (2) "Failure to Adequately Monitor Other Fiduciaries under ERISA." In response, Defendants filed

11

their Motion to Dismiss on June 23, 2025. (Doc. No. 18.) On July 23, 2025, Plaintiff filed his Opposition, to which Defendants replied on August 6, 2025. (Doc. Nos. 19, 20.)

On September 10, 2025, Plaintiff filed a Notice of Supplemental authority, to which Defendants responded on September 16, 2025. (Doc. Nos. 21, 22.) On October 1, 2025, Plaintiff filed a second Notice of Supplemental authority, to which Defendants responded on October 6, 2025. (Doc. Nos. 24, 25.) On March 6, 2026, Plaintiff filed a third Notice of Supplemental authority, to which Defendants responded on March 10, 2026. (Doc. Nos. 26, 27.)

Accordingly, Defendants' Motion to Dismiss is ripe for review.

### III. Standard of Review

In order to survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'" *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting in part *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–556 (2007)). For purposes of Rule 12(b)(6), "all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (internal citation and quotation marks omitted).

The measure of a Rule 12(b)(6) challenge — whether the Complaint raises a right to relief above the speculative level — "does not 'require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.'" *Bassett v. National Collegiate Athletic Ass'n.*, 528 F.3d 426, 430 (6th Cir. 2008) (quoting in part *Twombly,* 550 U.S. at 555–556).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Deciding whether a complaint states a claim for relief that is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679.

Consequently, examination of a complaint for a plausible claim for relief is undertaken in conjunction with the "well-established principle that 'Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009) (quoting in part *Erickson v. Pardus*, 551 U.S. 89 (2007)). Nonetheless, while "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 679.

## IV. Pleading ERISA duty-of-prudence claims

Fiduciary duties under ERISA are "the highest known to law." *Johnson v. Parker-Hannifin Corp.*, 122 F.4th 205, 213 (6th Cir. 2024) (quoting *Chao v. Hall Holding Co.*, 285 F.3d 415, 426 (6th Cir. 2002)). ERISA requires that a plan administrator discharge his duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). "The obligation includes 'a continuing duty to monitor trust investments and remove imprudent ones.'" *Smith v. CommonSpirit Health*, 37 F.4th

1160, 1165 (6th Cir. 2022) (quoting *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015)).

The duty of prudence is informed by trust law.  *Id.*  Under trust law, "[w]hether the trustee is prudent in the doing of an act depends upon the circumstances as they reasonably appear to him at the time when he does the act and not at some subsequent time when his conduct is called in question." *Id.* (citation omitted).  As further explained by the Sixth Circuit:

> The duty of prudence is a process-driven obligation. *See Smith v. CommonSpirit Health*, 37 F.4th 1160, 1166 (6th Cir. 2022) (calling the duty of prudence "largely a process-based inquiry"); *Pfeil v. State St. Bank & Tr. Co.*, 806 F.3d 377, 384 (6th Cir. 2015) (calling it a "prudent-process standard"); *see also Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 482-83 (8th Cir. 2020). When we enforce the duty of prudence, we focus on the fiduciary's "real-time decision-making process, not on whether any one investment performed well in hindsight." *Forman*, 40 F.4th at 448; *see also* Restatement (Third) of Trusts § 77 cmt. a (2007). For an imprudent-retention claim, we ask whether the fiduciary, at the time it chose to retain an investment, "employed the appropriate methods to investigate the merits of the investment." *Pfeil*, 806 F.3d at 384 (quoting *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 723 (6th Cir. 2000)). The ultimate question is whether the fiduciary engaged in a reasoned decision-making process when it decided to retain the investment. *Id.*; *see also Davis*, 960 F.3d at 482 ("This statutory duty of prudence establishes 'an objective standard' that focuses on 'the process by which' decisions are made, 'rather than the results of those decisions.'" (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009))); *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014).

*Johnson*, 122 F.4th at 213.

To plead a duty-of-prudence claim, a plaintiff is not required "to point to a higher-performing fund to demonstrate imprudence." *Id.* at 216.  "A meaningful benchmark may sometimes be one part of an imprudence pleading, but it is not required." *Id.*  "A plaintiff sufficiently states a claim of imprudence if it pleads facts sufficient to give rise to an inference of insufficient process." *Id.* (citing *Smith*, 37 F.4th at 1165–66; *Forman v. TriHealth, Inc.*, 40 F.4th 443, 446 (6th Cir. 2022)).  "Even when the alleged facts do not directly address the process by which the Plan was managed, a claim alleging a breach of fiduciary duty may still survive a motion to dismiss if the court, based on

14

circumstantial factual allegations, may reasonably infer from what is alleged that the process was flawed." *Stark v. KeyCorp*, No. 1:20-CV-01254, 2021 U.S. Dist. LEXIS 84813, at *16 (N.D. Ohio May 4, 2021) (Barker, J.) (cleaned up).

While a comparator is not necessarily required, Sixth Circuit case law informs what a plaintiff must plead to infer imprudence based upon a comparator. In *Smith*, the plaintiff compared "the Fidelity Freedom Funds' performance to the Fidelity Freedom Index Funds' performance for a five-year period, noting that the Freedom Funds trailed the Index Funds by as much as 0.63 percentage points per year." *Smith*, 37 F.4th at 1166. The Court found that the comparison between these two funds was insufficient at the pleading stage for several reasons. First, in contrast to the actively managed "Freedom Funds," the "Freedom Index Funds," "have the benefit of combining attractive features of active and passive management." *Id.* Based on the differences in management styles, the *Smith* Court observed that "each fund has distinct goals and distinct strategies, making them inapt comparators." *Id.* at 1167. Second, the *Smith* Court found that "[m]erely pointing to another investment that has performed better in a five-year snapshot of the lifespan of a fund that is supposed to grow for fifty years does not suffice to plausibly plead an imprudent decision—largely a process-based inquiry—that breaches a fiduciary duty." *Id.* It reasoned that "[a] side-by-side comparison of how two funds performed in a narrow window of time, with no consideration of their distinct objectives, will not tell a fiduciary which is the more prudent long-term investment option." *Id.* Third, the Court found that the "Freedom Funds" actually outperformed the "Freedom Index Funds" and "remained significantly more popular" as it "was the second-most popular target-date fund in the entire industry by market share." *Id.* at 1168.

Two years later, the Sixth Circuit decided *Johnson* in favor of the plaintiff. In that case, the

15

plaintiff alleged that the "Focus Funds," a passively managed fund, had a high turnover rate (90%) and underperformed its own S&P target date benchmark. *Johnson*, 122 F.4th at 215–16. The Court reasoned that the S&P benchmark "is inherently a meaningful benchmark" because "tracking an industry-recognized index is the 'investment goal' of a passively managed target date fund such as the Focus Fund." *Id.* at 217. Accordingly, the Court held that "[w]here a complaint alleges that a fund, by its design, sets a benchmark for itself and repeatedly fails to meet that benchmark, it is perfectly appropriate to submit to a jury the prudence of the administrator's process in retaining the fund despite that failure." *Id.* at 218. As applied to the Complaint in *Johnson*, the Sixth Circuit found that "it is certainly plausible that a prudent administrative process would find such performance unacceptable and would result in the Focus Funds' replacement," and that "[i]t is for the jury to decide whether the Funds' failure to meet the S&P benchmark in fact meant that a prudent administrative process would have resulted in their replacement." *Id.* at 219.

## V.    Summary of the Parties' Arguments

With these standards in mind, the Court next summarizes the parties' arguments.

### A.    Defendants' Motion to Dismiss

In their Motion to Dismiss, Defendants generally make five arguments as to why Plaintiff's duty-of-prudence claim fails, and one argument as to why Plaintiff's failure-to-monitor claim fails. Defendants argue that the duty-of-prudence claim fails because (1) the Morningstar Comparators are not meaningful benchmarks for the American Century TDFs, (2) the Large TDF Comparators are not meaningful benchmarks for the American Century TDFs, (3) the S&P Target Date Index is not a meaningful benchmark for the American Century TDFs, (4) even if Plaintiff alleged an adequate comparator, he has not alleged material underperformance, and (5) neither the alleged loss of market share nor purported turnover rates constituted "red flags" requiring closer inspection of the prudence

16

of the AmCen TDFs as a Plan option.  Defendants argue that the failure-to-monitor claim fails because it is derivative of Count One and Count One fails as matter of law.

The Court summarizes each of Defendants' arguments in turn below.

### 1. Defendants argue that the Morningstar Comparators are not meaningful benchmarks for the American Century TDFs

Defendants assert that "[t]he Morningstar Comparators are funds grouped by Plaintiff not for any similarities in composition, objectives, strategies, or risk but, rather, based on their inclusion in a Morningstar category."  (Doc. No. 18-1, PageID #138.)  According to Defendants, "a shared Morningstar label does not make one fund a meaningful benchmark for another."  (*Id.* at PageID #138–39.)  Defendants also assert that Plaintiff has not pled any non-conclusory facts establishing that the Morningstar Comparators are adequate comparators.  (*Id.* at PageID #139.)  Defendants contend that "Plaintiff's own sources . . . make clear that the Morningstar Comparators do not all have a mix of active and passive management styles."  (*Id.*)  Defendants argue that Plaintiff failed to sufficiently allege the management style (e.g. active or passive), the glide-path, and the asset allocation of the American Century TDFs and the Morningstar Comparators.  (*Id.* at PageID #139–142.)  Defendants conclude that "the many differences between the AmCen TDFs and the Morningstar Comparators make the Morningstar Comparators inapt comparators."  (*Id.* at PageID #142.)

### 2. Defendants argue that the Large TDF Comparators are not meaningful benchmarks for the American Century TDFs

Defendants make similar arguments with respect to the Large TDF Comparators.  Defendants argue that "the dearth of allegations regarding investment objectives, strategies, and risk profiles prevents the Large TDF Comparators from being a meaningful benchmark."  (Doc. No. 18-1, PageID #142.)  According to Defendants, "Plaintiff alleges no well-pleaded facts detailing the goals,

strategies, or risk tolerances of the Large TDF Comparators." (*Id.* at PageID #143.) Defendants assert that "[w]ithout information regarding the management styles, asset allocations, or glide paths, Count I fails to the extent it is based on the Large TDF Comparators." (*Id.*)

### 3. Defendants argue that the S&P Target Date Index is not a meaningful benchmark for the American Century TDFs.

Defendants next argue that "Plaintiff's final proposed comparator—the S&P Target Date Index—likewise fails." (*Id.* at PageID #143–44.) Defendants assert that "Plaintiff suggests, without explanation or citation to any factual source, that the AmCen TDFs 'were designed to meet industry-recognized benchmarks,' such that, '[b]y definition,' they 'share the same goals, strategies and risks as the indices they [we]re designed to replicate.'" (*Id.* at PageID #143–44 (quoting Doc. No. 1, ¶ 21).) According to Defendants, "[t]his assertion is intended to analogize to *Johnson* (whose language Plaintiff invokes, *see id.*), where the challenged funds were passively managed and tracked a specific market index." (*Id.*) But, Defendants assert, "Plaintiff alleges that the AmCen TDFs have 'a combination of active and passive investments' in their underlying holdings . . . making them definitionally unlike the funds in *Johnson*." (*Id.* at PageID #144 (quoting Doc. No. 1, ¶ 82).) Defendants further argue that "[t]he S&P Target Date Index is not a meaningful benchmark for other reasons, too, including because it is not an actual investment option available to investors." (*Id.*) Defendants conclude that "Plaintiff's failure to properly tailor his allegations to account for fund-specific differences suggests that the actual nature of his dispute is with fund strategy, which does not state a claim for breach of the duty of prudence." (*Id.* at PageID #144–45.)

### 4. Defendants argue that even if Plaintiff had identified a meaningful comparator for the American Century TDFs, the lack of material underperformance—or, in some cases, lack of any underperformance—defeats a cause of action for imprudence.

Defendants next argue that "the Complaint also fails because it does not allege

underperformance by the AmCen TDFs from which the Court can infer imprudence." (*Id.* at PageID #145.) Defendants argue that "the Complaint reflects that the AmCen TDFs saw positive returns on investments year after year, per every slice of performance data cited by Plaintiff." (*Id.*) Defendants further argue that "even though some proposed comparators performed better in certain cherry-picked years . . . a small degree of underperformance is weak circumstantial evidence that is insufficient to infer fiduciary breach, as fiduciaries are not required to pick the best performing fund." (*Id.* at PageID #145–46 (internal quotations omitted).) According to Defendants, "district courts around the country have rejected [prudence-based] breach of fiduciary duty claims based on . . . alleged short-term differences in performance of between 1.14[%] to 4.4%, which they deem immaterial." (*Id.* at PageID #146 (internal quotations omitted).) And here, Defendants assert that "the maximum alleged underperformance for any AmCen TDF vintage versus another TDF over any three- or five-year period selected by Plaintiff is 3.88%, below the threshold that courts find potentially reflects material underperformance from which imprudence may be inferred." (*Id.*) Further, Defendants assert that "Plaintiff's own allegations reflect that the AmCen TDFs actually achieved higher returns versus some proposed comparators across certain periods of time cherry-picked by Plaintiff." (*Id.* at PageID #147.) Finally, Defendants claim that the rest of the performance picture is laid out when one considers that Plaintiff conspicuously buries—or outright omits—performance data for certain years." (*Id.*)

       **5.**      **Defendants argue that neither alleged loss of market share nor purported turnover rates constituted "red flags" requiring closer inspection of the prudence of the AmCen TDFs as a Plan option.**

Defendants also challenge Plaintiff's allegations concerning market share and turnover rates. As to the former, Defendants assert that "Plaintiff devotes all of two paragraphs to pleading his

market-share argument for imprudence," but in those paragraphs, "Plaintiff pleads that the TDF market has seen monumental growth, nearly doubling in size over a selected period of time." (*Id.* at PageID #149.) Defendants claim that "[i]n such a fast-growing market, any TDF that did not take in new money at the same pace that the market expanded would, by definition, 'lose' market share." (*Id.*) Defendants assert that if "the AmCen TDFs were one of the twelve largest TDF suites in 2018," then it would have "remained one of the largest such funds, given that Plaintiff insists that the Large TDF Comparators are meaningful benchmarks throughout the Class Period." (*Id.*)

With respect to the turnover rate allegations, Defendants assert that "Plaintiff conflates the alleged turnover of the funds underlying the AmCen TDFs with the supposed turnover of the AmCen TDFs themselves." (*Id.*) Defendants further assert that "Plaintiff submits no allegations regarding the turnover rates of any of his proposed comparators, as would be needed to assess whether the AmCen TDF turnover rates stood out (or were 'red flags') or were on par with the industry." (*Id.* at PageID #150.) According to Defendants, "the article Plaintiff cites identifies turnover rates for numerous fund managers with TDF suites that Plaintiff promotes as comparators, and many of those turnover rates are higher than the 'red flag' threshold adopted by Plaintiff." (*Id.*)

### 6. Defendants argue that Count Two fails as a matter of law

Defendants argue that "Plaintiff's duty-to-monitor claim hinges on the viability of his underlying duty-of-prudence claim[,]" and therefore, "Plaintiff's failure to state a claim for imprudence forecloses a claim for breach of the duty to monitor, and Count II must be dismissed." (*Id.* at PageID # 150.)

### B. Plaintiff's Opposition

In response, Plaintiff largely ignores many of Defendants' arguments. Importantly, he does not respond to Plaintiff's arguments concerning underperformance. Instead, Plaintiff's

20

counterargument hinges solely on his interpretation of *Johnson*.  According to Plaintiff, *Johnson* "is materially similar" to this case and "has satisfied his pleading standard set out by the Sixth Circuit in *Johnson*."  (Doc. No. 19, PageID #249, 258.)

Plaintiff likens *Johnson* to his case in several ways:

- "Similar to the American Century TDFs in this case, [f]rom the time the Focus Funds launched until 2013, the Funds underperformed the S&P target date fund benchmark, an industry-accepted target date benchmark for Through target date funds used by investment professionals."  (*Id.* at PageID #250 (internal quotations omitted).)

- "Also much like the America Century TDFs, '[i]n addition to underperforming industry standards, the Focus Funds also faced high turnover rates. Turnover rates measure how often a fund changes its investments, with higher rates meaning the fund frequently buys and sells stocks or bonds.'"  (*Id.* at PageID #250 (quoting *Johnson*, 122 F.4th at 209).)

- "Finally, like the large percentage of the overall Plan the American Century TDFs make up in the present case . . . the Focus Funds 'constituted approximately $800 million of Plan participants' retirement savings,' a very large fraction of the total plan assets."  (*Id.* at PageID #250 (quoting *Johnson*, 122 F.4th at 209).)

- "The plaintiff in *Johnson* pointed to three defects that he claimed should have prompted a prudent fiduciary to remove the Focus Funds. Two are relevant here. First, Johnson argued that a prudent fiduciary would 'monitor changes in strategy or asset holdings,' and 'monitor a fund's turnover ratio and understand that excessive turnover can mean that the manager is attempting to remedy underperformance by deviating from the fund's strategy, warranting further scrutiny.' Because the Focus Funds had 'major changes in asset holdings, extremely high turnover, and substantial transaction costs,' a prudent fiduciary would have removed the Funds. Second, the plaintiff in Johnson argued that a prudent fiduciary would have removed the Focus Funds based on its underperformance compared to the S&P target date fund benchmark and alternative target date funds."  (*Id.* at PageID #250–251 (internal citations omitted).)

- "So, like the Focus Funds challenged in *Johnson*, the American Century TDFs were designed to meet industry-recognized benchmarks, the S&P Target Date Index. By definition, the American Century TDFs share the same goals, strategies, and risks as the indices they are designed to mimic."  (*Id.* at PageID #256–57.)

- "Plaintiff has satisfied his pleading standard set out by the Sixth Circuit in *Johnson*, and Plaintiff has sufficiently pleaded that the American Century TDFs were attempting to mimic the S&P target date fund, making it a meaningful benchmark."

21

(*Id.* at PageID #258.)

But Plaintiff acknowledges that *Johnson*'s facts were distinguishable in certain ways:

- "The Focus Funds were a 'through' target date fund . . . while American Century TDFs come in both 'to' and 'through' varieties." (*Id.* at PageID #249.)

- "Although the American Century TDFs are not passively managed like the Focus Funds in *Johnson*, they were designed to meet 'industry-recognized standards' for target date funds . . . and the Brookfield Plan Committee chose the S&P Target Date Index as their benchmark." (*Id.* at PageID #254.)

Applying *Johnson*, Plaintiff argues that "the issue is not whether American Century TDFs generated higher returns than comparators in the short-term (1 and 3 year performance metrics), on which Defendants focus . . . but whether such TDFs were appropriate for long-term investing for all of Brookfield's participant-employees." (*Id.* at PageID #254–55.)  Plaintiff asserts that "[i]t would make little sense to construe the 'meaningful benchmark' standard to mean that any replacement fund has to share the exact same conservative investment philosophy, as Defendants suggest they must . . . which prudent fiduciaries could have found unsuitable for their participant population" because "[t]he whole point of picking a new TDF to act as a default investment for the Plan is to pick a more suitable suite of TDFs that meet the demographic needs of the Plan participant population." (*Id.* at PageID #257.)

According to Plaintiff, "[t]he evidence plausibly indicates that starting at the beginning of the Class Period in April 2019, the American Century TDFs were not appropriate for long-term investing and Defendants should have known that fact." (*Id.* at PageID #255.)  Largely reciting the allegations in the Complaint, Plaintiff further argues that "[t]aken together, because of the underperformance and high turnover rates for the American Century TDFs, Defendants were or should have been aware from the beginning of the Class Period in April 2019 that the American Century TDFs were not an

22

appropriate or suitable investment for the Plan." (*Id.* at PageID #256.)  Plaintiff  concludes that "[b]ecause as set out in detail in the Complaint, the American Century TDFs systematically underperformed their own benchmark, as well as all other comparable target date funds at-large and their Morningstar category, had an alarming drop in market share, and a red flag number with regard to the American Century TDFs turnover rate, Plaintiff has plausibly established a claim for breach of the duty of prudence with regard to the Plan's imprudent retention of the American Century TDFs." (*Id.* at PageID #258.)

Plaintiff also acknowledges that his "failure to monitor claim, brought against Brookfield, is derivative of Plaintiff's duty of prudence claim." (*Id.* at PageID #259.)  Because Plaintiff contends that his duty-of-prudence claim survives dismissal, so too must his failure-to-monitor claim.  (*Id.*)

### C.    Defendants' Reply

Defendants focus their Reply on three areas.  First, Defendants correctly point out that Plaintiff did not respond to their argument concerning underperformance.  (Doc. No. 20, PageID #262–63.)

Second, Defendants contend that *Johnson* does not control this case.  Defendants argue that "*Johnson* recognized that a market index can be a meaningful benchmark when the challenged fund is designed to replicate it through passive management." (*Id.* at PageID #267.)  Defendants contend that "nothing about this observation suggests that an index is always a meaningful benchmark, irrespective of the fund's management style" because "*Johnson* repeatedly recognized that its discussion was specific to passively managed funds and expressly contrasted why an actively managed fund would be inappropriate to compare to an index." (*Id.*)  Defendants contend that *Johnson* does not suggest that "this straightforward principle should be, or could be, applied where

the fund being compared was actively managed." (*Id.*)  Defendants conclude that "because he concedes that the AmCen TDFs were not passively managed . . . Plaintiff admits that the critical predicate in *Johnson*— the passive management style of the challenged funds—is absent in this case." (*Id.*)

Third, Defendants argue that "Plaintiff's attempted comparisons to the 'S&P Target Date Index' would remain unavailing because that particular index was not, in fact, the self-selected benchmark for the AmCen TDFs."  (*Id.* at PageID #268.)  Defendants assert that Plaintiff "deliberately and self-consciously refuses to say where the purported benchmark allegedly was selected."  (*Id.*)  Defendants ask this Court to take judicial notice of a prospectus referenced in the Complaint, demonstrating that, "each vintage of the AmCen TDFs lists the S&P Target Date 'to' Index for the corresponding TDF vintage.  (*Id.* at PageID #268–69.)  Defendants claim that "the S&P Target Date 'to' Index for a particular year is not the "S&P Target Date Index."  (*Id.* at PageID #269.) And because of this distinction, Defendants argue that *Johnson* is inapplicable because that case involved a benchmark "through" target date funds.  (*Id.*)

## VI.     Analysis

After reviewing the Complaint, the parties' briefing and applicable law, the Court finds, as explained in greater detail below, that Plaintiff's Complaint fails to state a claim upon which relief can granted.

### A.     Plaintiff has not alleged a plausible duty-of-prudence claim

As explained below, the Court finds that even if Plaintiff has sufficiently alleged comparators, Plaintiff's duty-of-prudence claims nonetheless fails because he has not alleged sufficient underperformance for the Court to infer imprudence.

### 1. Plaintiff has not plausibly alleged imprudence based on his comparison to the S&P 500 Target Date Index

Because the parties' briefing primarily focuses on *Johnson*'s applicability to this case, the Court first addresses whether Plaintiff's duty-of-prudence claim can be based upon the S&P 500 Target Date Index.  As explained *supra*, *Smith* teaches that a plaintiff cannot compare an active fund with a passive fund to demonstrate imprudence and *Johnson* teaches that a plaintiff can plead a duty-of-prudence claim based upon a passive fund underperforming its own internal benchmark.  What these cases do not address is whether a plaintiff can plead a duty-of-prudence claim based upon an *active* fund underperforming its own internal benchmark.[8]  The parties have not pointed the Court to any authority directly answering this question.  Upon review of the parties' briefing, and applicable Sixth Circuit law, the Court finds *Smith* more applicable to Plaintiff's Complaint.  Given the material differences between active and passive funds, the Court finds that the rule in *Johnson* does not apply to actively managed funds.

In an actively managed fund, "the portfolio manager actively makes investment decisions and initiates buying and selling of securities in an effort to maximize return."  *Smith*, 37 F.4th at 1163.  By contrast, passively managed funds "simply track the stocks in, say, the S&P 500 or some other stock or bond index."  *Forman v. TriHealth, Inc.*, 40 F.4th 443, 446 (6th Cir. 2022).  *Johnson* recognized that "[b]ecause tracking an industry-recognized index is the 'investment goal' of a passively managed target date fund such as the Focus Funds, a relevant market index is inherently a meaningful benchmark."  *Johnson*, 122 F.4th at 217.  Citing to *Smith*, the *Johnson* Court found that

---

[8] The Complaint does not allege whether the American Century TDFs are actively or passively managed.  Plaintiff, however, asserts in its Opposition that "the American Century TDFs are not passively managed like the Focus Funds in *Johnson*."  (Doc. No. 19, PageID #254.)  Thus, by Plaintiff's own admission, the American Century TDFs are actively managed.

25

"[b]y definition, then, the Focus Funds share the same goals, strategies, and risks as the indices they are designed to replicate." *Id.*  In a footnote, however, *Johnson* also recognized that "an active fund is not trying to mimic an index, managers have more flexibility to adjust asset allocation based on market conditions or their outlook." *Id.* at 217, n.3 (citing *Smith*, 37 F.4th at 1163).  And it would not make sense for an actively managed fund to try to mimic an index like the S&P 500 given the fees associated with active management.  *Smith*, 37 F.4th at 1163 ("Little surprise, actively managed funds, which require considerable judgment and expertise, charge more than passively managed funds, which require little judgment and expertise").

In this case, Plaintiff's allegations concerning the S&P 500 Target Date Index are sparse.  Plaintiff alleges, like the plaintiff in *Johnson*, that "[t]he American Century TDFs were designed to meet industry-recognized benchmarks" and "share the same goals, strategies, and risks as the indices they are designed to replicate."  (Doc. No. 1, ¶ 21.)  Plaintiff further alleges that "the American Century TDFs materially and dramatically underperformed their own benchmarks, the S&P Target Date Index, during the three-year period before the beginning of the Class Period in 2018."  (*Id.* at ¶ 27.)  To be sure, it is certainly possible that an actively managed fund could go against the norm and attempt to mimic the S&P 500 Target Date Index like Plaintiff alleges here.  But as in *Smith*, "a side-by-side comparison of how" the American Century TDFs and the S&P 500 "performed in a narrow window of time, *with no consideration of their distinct objectives*, will not tell a fiduciary which is the more prudent long-term investment option."  *Smith*, 37 F.4th at 1167 (emphasis added).

Plaintiff's bare-bones allegations do not explain why the American Century TDFs are a unique actively managed fund that is attempting to mimic the S&P 500 Target Date Index in such a way that the S&P 500 Target Date Index itself can be an adequate comparator.  *Cf. Bekker v.*

26

*Neuberger Berman Grp. LLC*, No. 16 CV 6123-LTS-BCM, 2018 U.S. Dist. LEXIS 166690, at \*17 (S.D.N.Y. Sept. 27, 2018) ("Plaintiff's allegation that the VEF, an actively-managed fund, was benchmarked to the S&P 500, which the VIIIX, an index fund, tracked, does not demonstrate the requisite comparability").  Accordingly, the Court finds that the S&P 500 Target Date Index cannot serve as a meaningful comparator here.  *See Batt v. 3M Co.*, No. 25-cv-3149 (ECT/DTS), 2026 U.S. Dist. LEXIS 48639, at \*14 (D. Minn. Mar. 10, 2026) ("But that important allegation is missing here; Plaintiffs do not claim the 3M TDF Series are designed to track the S&P Indices"); *In re LinkedIn ERISA Litig.*, No. 5:20-cv-05704-EJD, 2021 U.S. Dist. LEXIS 221294, at \*26 (N.D. Cal. Nov. 16, 2021) ("Plaintiffs have therefore pled nothing more than the conclusory underperformance of an actively managed fund as compared to a market index benchmark, which is insufficient on its own to state a claim for breach of prudence"); *Wehner v. Genentech, Inc.*, No. 20-cv-06894-WHO, 2021 U.S. Dist. LEXIS 111341, at \*25–26 (N.D. Cal. June 14, 2021) (finding "[g]eneral assertions that the Roche TDFs, the retail TDFs, and the S&P Indices 'all share the same overall purpose and strategy'" insufficient "to support an apples-to-apples comparison without factual allegations that compare the products' styles and strategies to support a finding of 'meaningful benchmark.'").[9]

Nevertheless, *Johnson*'s applicability is not dispositive.  Even if the S&P 500 Target Date Index is an adequate comparator here, Plaintiff's claim, to the extent premised upon the S&P 500 Target Date Index, fails for a separate reason.  Plaintiff alleges that the American Century TDFs

---

[9] The Court is not persuaded by Plaintiff's citation to *Fulton v. FCA US LLC*, No. 24-cv-13159, 2025 U.S. Dist. LEXIS 193340 (E.D. Mich. Sept. 30, 2025) in his second Notice of Supplemental Authority.  In that case, the Eastern District of Michigan followed *Johnson* and held that the plaintiff could compare the funds at issue with their own internal benchmarks.  Upon the Court's review of *Fulton*, the opinion, however, does not address whether the funds at issue were passive, like in *Johnson*, or active, like funds at issue in this case.  Because the *Fulton* opinion does not address how the funds were managed, it does not guide the Court's analysis here.

underperformed the S&P 500 Target Date Index "for the three-year period ending on December 31, 2018" by as little as 0.68% and as high as 1%.  (Doc. No. 1, ¶ 62.)  Then, according to Plaintiff, "[t]he same pattern of underperformance . . . continued after January 1, 2019," ranging from 0.39% to 1.67%.  (*Id.* at ¶ 63.)  Next, Plaintiff alleges that "the underperformance of the American Century TDFs has become more severe since 2021," ranging from 0.57% to 2.80%.  (*Id.* at ¶ 64.)  During the same period, Plaintiff does not assert that the American Century TDFs failed to make positive returns. In fact, Plaintiff pleads the opposite.  (*Id.* at ¶¶ 66 (listing charts showing positive performance for American Century TDFs during the "three-year performance before 12/31/2018," "performance since 1/1/2019," and "performance since 1/1/2021").)

Given that the American Century TDFs had positive returns, and only slightly underperformed the S&P 500 Target Date Index, the Court finds that Plaintiff has not alleged sufficient facts to infer imprudence. In *Smith*, the Sixth Circuit recognized that:

> Merely pointing to another investment that has performed better in a five-year snapshot of the lifespan of a fund that is supposed to grow for fifty years does not suffice to plausibly plead an imprudent decision—largely a process-based inquiry—that breaches a fiduciary duty. Precipitously selling a well-constructed portfolio in response to disappointing short-term losses, as it happens, is one of the surest ways to frustrate the long-term growth of a retirement plan. *See* Ellis, *supra*, at 83-87, 119. Any other rule would mean that every actively managed fund with below-average results over the most recent five-year period would create a plausible ERISA violation. Unless and until it becomes feasible to have all actively managed funds perform above average, that would lead to the disappearance of this option in ERISA plans.

*Smith*, 37 F.4th at 1166.  Consistent with *Smith*, this Court has previously explained that:

> "allegations of consistent, ten-year underperformance may support a duty of prudence claim." *Patterson v. Stanley*, No. 16-cv-6568 (RJS), 2019 WL 4934834, at *10 (S.D.N.Y. Oct. 7, 2019). However, "the underperformance must be substantial." *Id.* To illustrate, in *Patterson*, the plaintiffs alleged that the challenged fund had an average annual return of 7.42%, while its benchmark had an average annual return of 8.16% over the same ten-year period. *Id.* The court held that "such

28

a small disparity in performance relative to its benchmark does not support the inference that Defendants were imprudent to retain the Mid Cap Fund in the set of Plan offerings." *Id.* Similarly, in *Birse*, the plaintiffs alleged that the challenged fund underperformed its benchmark by an average of 2.11% for six years, and that had the defendant replaced the fund with another, class members would have realized 5% higher returns on their investment. 2019 WL 1292861, at *5. The court dismissed the plaintiffs' claim for breach of the fiduciary duty of prudence, holding the plaintiffs "improperly rel[ied] on hindsight to allege [the defendant] should have offered a better performing fund rather than indicating how an investigation would show an improvident process." *Id.* The court also noted that the plaintiffs "cite[d] allegedly similar cases that have survived dismissal, but Plaintiffs fail[ed] to explain that the complaints at issue in those cases contained very different allegations and involved funds that performed much lower than the Fund's 2-3% underperformance." *Id.* at *5 n.2.

*Stark*, 2021 U.S. Dist. LEXIS 84813 at *35–36.

Accordingly, courts throughout the country have found that underperforming by only one, two or even three percentage points is insufficient to infer imprudence at the pleading stage. *See, e.g.*, *Entrom v. SAS Inst.*, No. 5:24-CV-105-D, 2025 U.S. Dist. LEXIS 37602, at *12–13 (E.D.N.C. Mar. 3, 2025) (finding plaintiffs did not plausibly plead underperformance when "[t]he JPM funds generally provided returns within one-to-two percentage points of plaintiffs' handpicked comparator funds"); *Gonzalez v. Northwell Health, Inc.*, No. 20-CV-3256 (RPK) (RLM), 2024 U.S. Dist. LEXIS 251257, at *25–29 (E.D.N.Y. Mar. 26, 2024) (underperformance ranging from 0.43% to 2.99% insufficient to infer imprudence); *Ruilova v. Yale-New Haven Hosp., Inc.*, No. 3:22-cv-00111-MPS, 2023 U.S. Dist. LEXIS 33791, at *53 (D. Conn. Mar. 1, 2023) (underperformance ranging from "less than 1%" to 3.63% insufficient to infer imprudence); *Young Cho v. Prudential Ins. Co. of Am.*, No. 19-19886 (JMV) (SCM), 2021 U.S. Dist. LEXIS 185397, at *29 (D.N.J. Sept. 21, 2021) ("More importantly, Plaintiff has not alleged that the underperformance was sufficiently substantial: The Prudential Retirement Real Estate Fund in its five-year trailing performance had underperformance percentages ranging from .07% to 3.71% (and this was an outlier with the next highest being 1.08%),

29

and its ten-year trailing performance reflected underperformance ranging from 1.19% to 2.86%; The Prudential High Yield Collective Investment Trust in its five-year trailing performance had underperformance percentages ranging from .05% to 1.06%; and The Wellington Trust Company CIF II Diversified Inflation Hedges Portfolio in its five-year trailing performance had underperformance percentages ranging from .22% to 1.07%.").

Applying these cases here, Plaintiff has not alleged sufficient underperformance to infer imprudence. From 2016 to 2018, the American Century TDFs underperformed the S&P 500, at worst, by 1.00%. (Doc. No. 1, ¶ 62.)  Then, in 2019, the American Century TDFs underperformed the S&P 500, at worst, by 1.67%. (*Id.* at ¶ 63.)  After 2021, the American Century TDFs underperformed the S&P 500, at worst, by 2.80%. (*Id.* at ¶ 64.)  Thus, even assuming that Plaintiff is correct (as the Court must do at the pleading stage) that the American Century TDFs set the S&P 500 Target Date Index as it owns benchmark, such modest underperformance is insufficient to infer imprudence.  *Compare with Kistler v. Stanley Black & Decker, Inc.*, No. 3:22-cv-966 (SRU), 2024 U.S. Dist. LEXIS 117419, at *32–33 (D. Conn. July 3, 2024) (eleven instances of underperformance of more than 3% and cumulative underperformance of 9.08% and 11.90% sufficient to infer imprudence); *Jacobs v. Verizon Communs., Inc.*, No. 16 Civ. 1082 (PGG), 2017 U.S. Dist. LEXIS 162703, at *24–27 (S.D.N.Y. Sept. 28, 2017) (allegations of ten-year annualized underperformance of 8.63% sufficient to state a claim).

*Johnson* does not mandate a different outcome even if the S&P 500 Target Date Index is an adequate comparator.  In stark contrast to the allegations here, the *Johnson* Court relied on the allegation that "[f]rom 2014 on, the Focus Funds continued to '*substantially* underperform' the S&P target date fund benchmark as well as other target date funds." *Johnson*, 122 F.4th at 211 (emphasis

added). In finding that the amended complaint stated a claim, the *Johnson* court found that the funds "*systematically* underperformed" the S&P 500 benchmark. *Id.* at 218 (emphasis added). While Plaintiff alleges here that the American Century TDFs "materially" and "dramatically" underperformed their own benchmarks," the data he provides in the Complaint tells a different story. Put simply, the allegations here do not show that the American Century TDFs "substantially" or "systematically" underperformed S&P 500 Target Date Index.[10]

Accordingly, the Court finds that Plaintiff has not alleged a plausible duty-of-prudence claim based on his allegations comparing the American Century TDFs to the S&P 500 Target Date Index.

### 2. Plaintiff has not plausibly alleged imprudence based on his comparison to the Morningstar Comparators

Plaintiff's allegations concerning the Morningstar Comparators are more robust than his allegations concerning the S&P 500. Plaintiff alleges: (1) [t]he Morningstar Comparator Funds are grouped in the same Morningstar Category as the American Century Target Date Series;" (2) "[a] closer look at the American Century Target Date Series and Morningstar Comparator Funds further demonstrate[s] they had similar underlying investments and strategies;" (3) "[t]he American Century Target Date Series and each of the Morningstar Comparator Funds are Large Cap Blend series, meaning their underlying holdings are a combination of active and passive investments;" and (4)

---

[10] The Court rests its interpretation of *Johnson* on the Sixth Circuit's opinion alone. Independent of the *Johnson* opinion, the Court also takes judicial notice of the allegations in the amended complaint filed in *Johnson* because the existence of allegations themselves is not subject to dispute. *Scotty's Conrt. & Stone v. United States*, 326 F.3d 785, n.1 (6th Cir. 2003) ("We take judicial notice of this page of a brief submitted as part of the proceedings in a different case"). Although not addressed in the *Johnson* opinion, the Court notes that the underperformance alleged in *Johnson* was far more severe than what is alleged here. *See Johnson v. Parker-Hannafin Corporation*, No. 1:21-cv-00256-BMB, Doc. No. 20 at ¶¶ 69, 93–94 (alleging underperformance ranging from 4%–17% when compared to other TDFs, and underperformance ranging from less than 1% to almost 10% when compared to the S&P 500 benchmark).

"[t]he American Century Target Date Series and all of the Morningstar Comparator Funds have a 'through' glidepath." (Doc. No. 1, ¶¶ 80–82, 85.)

Defendants' problem with Plaintiff's comparison to the Morningstar Comparator Funds is that "a shared Morningstar label does not make one fund a meaningful benchmark for another." (Doc. No. 18-1, PageID #138–39.) Defendants reach this conclusion by citing *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 281 (8th Cir. 2022). There, the plaintiff compared the funds at issue to their "peer groups." *Id.* at 281. The Eighth Circuit found that the plaintiff could not rely on general comparisons to a peer group when there was "no explanation of what types of funds are in each group, much less the criteria used to sort them." *Id.* The *Matousek* Court found that the plaintiff did not provide information concerning "whether [the peer group funds] hold similar securities, have similar investment strategies, and reflect a similar risk profile." *Id.*; *see also Batt*, 2026 U.S. Dist. LEXIS 48639 at *22 ("the fact that Morningstar categorized the 3M TDF Series together with the comparator TDF series does not plausibly show what the meaningful-benchmark standard requires").

But Plaintiff here alleges more than just a generic comparison to a Morningstar category like the plaintiff did in *Matousek*. In addition to sharing the same Morningstar category, Plaintiff alleges American Century TDFs and Morningstar Comparator Funds "had similar underlying investments and strategies," "are Large Cap Blend series, meaning their underlying holdings are a combination of active and passive investments," and "have a 'through' glidepath." (Doc. No. 1, ¶¶ 80–82, 85.)

The parties have not provided caselaw directly on point addressing whether these allegations are sufficient to state a claim. Upon the Court's own research, caselaw is not uniform. Some courts, including those within this Circuit, have found that allegations like Plaintiff's here are sufficient to state a claim. *Parker v. GKN N. Am. Servs.*, No. 21-12468, 2022 U.S. Dist. LEXIS 154358, at *11

32

(E.D. Mich. Aug. 26, 2022) (denying motion to dismiss based on comparison to funds listed in the same Morningstar category because "these categories function as comparators in areas that include the potential risks and rewards of the fund"); *Dover v. Yanfeng US Auto. Interior Sys. I LLC*, 563 F. Supp. 3d 678, 688 (E.D. Mich. 2021) ("While it would have been preferrable for Plaintiffs to provide more detailed information as to why the specific Morningstar indexes listed are, in fact, accurate comparators, parties in similar ERISA actions routinely reference these indexes, or expert testimony that cites these indexes, to allege a breach of duty").[11]  But other courts have reached the opposite conclusion.  *See Batt*, 2026 U.S. Dist. LEXIS 48639, at *22 ("Without more, the fact that Morningstar categorized the 3M TDF Series together with the comparator TDF series does not plausibly show what the meaningful-benchmark standard requires"); *Maclas v. Sisters of Charity of Leavenworth Health Sys.*, No. 23-cv-01496-LTB-SBP, 2025 U.S. Dist. LEXIS 273302, at *15–16 (D. Colo. Jan. 6, 2025) (complaint failed to state a claim despite the plaintiff alleging that the comparator funds were "in the same Morningstar category," "that the underlying holdings for all funds in the Comparator Index 'match the risk return profile for this category'"; that "the JPM TDFs and the Comparator Funds all 'concentrate their holdings in the large blend risk/return category;' and that "the JPM TDFs and the Comparator Funds are all 'through' target date funds").  Based upon its review of this case law, this Court finds that the Morningstar Comparator Funds are adequate comparators.

---

[11] *See also Gaines v. BDO USA, LLC*, 663 F. Supp. 3d 821, 829 (N.D. Ill. Mar. 21, 2023) (denying motion to dismiss based on allegations that the funds at issue "substantially underperformed their respective Morningstar fund categories" and that "each fund in the same category 'share[s] core similarities.'"); *Moler v. Univ. of Md. Med. Sys.*, No. 1:21-cv-01824-JRR, 2022 U.S. Dist. LEXIS 124804, at *10, n.7 (D. Md. July 13, 2022) ("Plaintiffs have provided comparator funds in the same Morningstar category that use the same benchmark market index as the funds at issue. The court is satisfied that the requirement of a meaningful benchmark has been met at the motion to dismiss stage"); *Synder v. UnitedHealth Grp., Inc.*, No. 21-1049 (JRT/BRT), 2021 U.S. Dist. LEXIS 230878, at *12 (D. Minn. Dec. 2, 2021) ("the Morningstar Comparators constitute meaningful benchmarks because they fall within the same universe, and incorporate similar purposes, asset allocations, and risk exposure as the Wells Fargo TDFs").

But even if the Morningstar Comparator Funds are adequate comparators, Plaintiff's claim fails because he has not alleged meaningful underperformance.  For each of the American Century TDFs, Plaintiff provides charts detailing the one-, three- and five-year returns when compared to the Morningstar Comparator Funds and "their Morningstar benchmarks."  (Doc. No. 1, ¶¶ 90, 92, 96.)  The Court has reviewed these charts and notes that the American Century TDFs did outperform the Morningstar Comparators and "their Morningstar benchmarks" in certain instances.  (*See id.*)

Excluding those instances, Plaintiff's best case for underperformance is his data concerning the one-year returns.  (Doc. No. 1, ¶ 96, Appendix A.) Based on that data, Plaintiff alleges underperformance of up to 7.66%, which is near the range of plausible imprudence. *Kistler*, 2024 U.S. Dist. LEXIS 117419 at *32–33; *Jacobs*, 2017 U.S. Dist. LEXIS 162703 at *24–27.  This data, however, is based on four nonconsecutive years: 2019, 2021, 2023 and 2024.  Such a small window of time cannot plausibly establish imprudence.  *Smith*, 37 F.4th at 1166 ("Merely pointing to another investment that has performed better in a five-year snapshot of the lifespan of a fund that is supposed to grow for fifty years does not suffice to plausibly plead an imprudent decision").

When looking at the larger data sets, the three- and five-year data do not show material underperformance.  For example, based on the three-year annualized performance data alleged in the Complaint, the range of outperformance generally was between less than 1% and 3%, and never exceeding 4%. (Doc. No. 1, ¶ 90; Appendix A.)  The data is even less compelling for the five-year annualized performance data alleged in the Complaint. (Doc. No. 1, ¶ 92; Appendix B.)  The range of outperformance was generally between less than 1% and 2%.  There were only two instances of outperformance of an amount higher than 3% based on the five-year data.[12]

---

[12] The American Century Retirement 2035 Trust Class XI and the American Century Retirement 2040 Trust Class XI were outperformed by, at most, 3.21% and 3.18% respectively from January 1, 2017 through December 31, 2021.

Simply put, "allegations that the [American Century TDFs] typically, if modestly, underperformed relative to the [Morningstar Comparators] for a limited number of years are not enough to carry plaintiffs' claims of breach of defendants' fiduciary duties past the pleading threshold." *Abel v. CMFG Life Ins. Co.*, No. 22-cv-449-wmc, 2024 U.S. Dist. LEXIS 14535, at \*15–16 (W.D. Wisc. Jan. 26, 2024) (relying on *Smith* to conclude that allegations of underperformance "ranging from 0.2% to around 5%, with the average underperformance being between 1 and 3%" insufficient to infer imprudence); *compare with Karpik v. Huntington Bancshares, Inc.*, No. 2:27-cv-1153, 2019 U.S. Dist. LEXIS 224264, at \*14 (S.D. Ohio Sept. 26, 2019) (denying motion to dismiss duty-of-prudence claim based upon allegations that the fund "dramatically underperformed the market" and "was ranked last by Morningstar out of 927 funds").  Plaintiff's allegations establish that the American Century TDFs performed slightly worse than some of their peer funds from 2017 through 2024.[13]  Accordingly, even though this Court has concluded that the Morningstar Comparators are adequate comparators, the American Century TDFs modest underperformance is insufficient to infer imprudence. *Entrom*, 2025 U.S. Dist. LEXIS 37602 at \*12–13; *Abel*, 2024 U.S. Dist. LEXIS 14535 at \*15–16; *Gonzalez*, 2024 U.S. Dist. LEXIS 251257 at \*25–29; *Ruilova*, 2023 U.S. Dist. LEXIS 33791 at \*53.[14]

---

[13] In fact, another Court has observed that "the American Century TDFs yielded positive returns and outperformed the median TDF in their Morningstar peer group with significant frequency" between 2016 and 2023.  *Phillips v. Cobham Advanced Elec. Sols., Inc.*, No. 23-cv-03785-EKL, 2025 U.S. Dist. LEXIS 184960, at \*14–16, 25–26 (N.D. Cal. Sept. 19, 2025).

[14] Plaintiff's citation to *McGeathy v. Reinalt-Thomas Corp.*, No. CV-25-01439-PHX-DLR, 2026 U.S. Dist. LEXIS 45208 (D. Ariz. Mar. 4, 2026) does not warrant a different conclusion.  That Court did find that the plaintiff alleged meaningful benchmarks and underperformance relative to American Century TDFs.  *Id.* at \*10.  But that court provided no analysis as to why the underperformance was sufficiently alleged.  Given the weight of authority concerning the allegations necessary to plead underperformance, the Court does not find *McGeathy* persuasive.  *Compare with Phillips*, 2025 U.S. Dist. LEXIS 184960 at \*16–17 ("Plaintiffs' allegations comparing the American Century TDFs to the Morningstar peer group do not support an inference that the Committee breached its duty of prudence").

### 3.    Plaintiff has not plausibly alleged imprudence based on his comparison to the Large TDF Comparator Funds

For similar reasons, the Court finds that Plaintiff cannot base his duty-of-prudence claim based on the alleged comparison between the American Century TDFs and the LargeTDF Comparator Funds.  Plaintiff's allegations concerning the LargeTDF Comparator Funds are primarily set forth in one paragraph. (Doc. No. 1, ¶ 67 ("All of the Large TDF Comparator Funds had similar structure, objectives, strategy, and risk profile to the American Century TDFs, and all were designed to provide essentially the same type of investment experience to plan participants: 'a long-term investment strategy based on holding a mix of stocks, bonds and other investments (this mix is called an asset allocation) that automatically changes over time as the participant ages.'").)  There is case law suggesting that these barebones allegations are insufficient.  *Compare Hall v. Cap. One Fin. Corp.*, No. 22-cv-00857, 2023 U.S. Dist. LEXIS 35391, at *21 (E.D. Va. Mar. 1, 2023) ("the Amended Complaint remains silent on whether the Comparator TDFs use 'through' or 'to' retirement glidepaths; whether the Comparator TDFs invest only in actively-managed or passively-managed funds; or how the Comparator TDFs' underlying equity and bond funds are allocated among the types and categories of possible equity and bond funds. In short, the Amended Complaint makes no factual allegations demonstrating that the Comparator TDFs are meaningful comparators to the BlackRock TDFs"); *with Fulton*, 2025 U.S. Dist. LEXIS 193340 at *21–22 ("The Court is less certain, however, that the five Comparator Funds are useful measures of the FCA TDFs' performance given their distinct goals and strategies. But the Court finds that whether the Comparator TDFs are similar, and whether the FCA TDFs performed significantly worse, is best left for resolution at summary judgment or by a factfinder at trial").

Even assuming these allegations are sufficient to establish that the LargeTDF Comparator

36

Funds are adequate comparators, Plaintiff has failed to allege sufficient underperformance to infer imprudence.  Plaintiff alleges that "the American Century TDFs have also underperformed compared to the Large TDF Comparator Funds during the three-year period ending December 31, 2018, and since 2019 and 2021."  (Doc. No. 1, ¶  66.)  But Plaintiff has not alleged meaningful underperformance.  According to Plaintiff, the American Century TDFs underperformed the Large TDF Comparators, at worst, (1) by only 1.59% to 2.36% during the three-year period preceding December 31, 2018; (2) by only 1.19% to 2.77% since January 1, 2019; and (3) by 0.89% to 2.73% since January 1, 2021.  (*Id.*)  Further, in some instances, the American Century TDFs outperformed the Large TDF Comparators.  *Id.*  Again, for the same reasons addressed at length above, such modest underperformance is insufficient to infer imprudence.  *See*, *e.g.*, *Entrom*, 2025 U.S. Dist. LEXIS 37602 at *12–13; *Abel*, 2024 U.S. Dist. LEXIS 14535 at *15–16; *Gonzalez*, 2024 U.S. Dist. LEXIS 251257 at *25–29; *Ruilova*, 2023 U.S. Dist. LEXIS 33791 at *53.  Accordingly, even if the LargeTDF Comparator Funds are adequate comparators, the American Century TDFs modest underperformance is insufficient to infer imprudence.

> **4.** **Plaintiff has not sufficiently alleged imprudence based upon the American Century TDFs alleged turnover rates**

Having found that Plaintiff has not alleged sufficient underperformance to infer imprudence, the Court finally assesses whether Plaintiff's Complaint infers imprudence based upon the American Century TDFs alleged turnover rates.  Plaintiff only points the Court to *Johnson* to support his argument that high turnover rates can infer imprudence.  *Johnson*, however, is distinguishable.  As the majority in *Johnson* recognized, the plaintiff did "not rely only on an allegation that past turnover *on its own* would compel a prudent administrator to replace the Focus Funds, but rather asserts that turnover (even historical turnover) would, when combined with the rest of the Funds'

37

flaws, compel an administrator acting pursuant to a prudent process to replace the Funds." *Johnson*, 122 F.4th at 215. The *Johnson* majority thus undertook to answer "whether Johnson's allegations of high turnover rate *and* underperformance, *taken together*, sufficiently state a claim for imprudence under ERISA." *Id.* at 216 (emphasis added). The Court answered that question in the affirmative: "[a] jury could plausibly find that a prudent decision-making process would have considered the Funds' turnover and underperformance and would have arrived at the conclusion that retaining the funds would not be in the Plan's best interests." *Id.* at 220. Therefore, *Johnson* stands for the proposition that underperformance *and* high turnover rates can sometimes infer imprudence. *See id.* at 220.

But, as explained above, Plaintiff has not sufficiently alleged underperformance. Plaintiff has not cited any authority that holds that a high turnover rate, standing alone, is sufficient to infer imprudence. And the Court could not find any. Furthermore, the turnover rates alleged here (68% to 72%) are not nearly as high as the 90% turnover rate alleged in *Johnson*. *See Johnson*, 122 F.4th at 219, n.7. Indeed, this high turnover appears to not have had much of a meaningful effect, if any, on the performance of the American Century TDFs. As explained above, the American Century TDFs, at times, marginally underperformed some of its alleged comparators by less than 1%, and even outperformed their alleged comparators. (*See* Doc. No. 1, ¶¶ 90, 92, 96; s*ee also* Appendix A, B & C.) The high turnover rate and "the different performance rates between the funds may be explained by a 'different investment strategy,'" and not necessarily imprudence. *Smith*, 37 F.4th at 1167 (quoting *Meiners v. Wells Fargo & Co.*, 898, F.3d 820, 822–23 (8th Cir. 2018)). For that reason, the Court finds that Plaintiff has not plausibly alleged imprudence based upon the alleged high

38

turnover rates.[15]

In sum, the Court concludes that Plaintiff has not alleged plausible imprudence based upon his allegations of underperformance and high turnover rates.  The Court therefore dismisses Plaintiff's duty-of-prudence claim.[16]

### B.    Because Plaintiff's duty-of-prudence claim fails to state a claim, his failure to monitor claim also fails to state a claim

The parties agree that Plaintiff's failure-to-monitor claim is dependent upon the success of his duty-of-prudence claim.   Accordingly, Plaintiff's failure-to-monitor claim is also dismissed for failure to state a claim.  *See*, *e.g.*, *England v. Denso Int'l Am., Inc.*, No. 22-11129, 2023 U.S. Dist. LEXIS 131386, at *27–28 (E.D. Mich. July 28, 2023) ("Plaintiffs have failed to state plausible claims for breach of the duty of prudence, and, therefore, the Court dismisses their claims for breach of the duty to monitor"); *Saumer v. Cliffs Natural Res. Inc.*, No. 1:15-cv-954-DAP, 2016 U.S. Dist. LEXIS 185459, at *27 (N.D. Ohio Apr. 1, 2016) ("at least one circuit—as well as district courts in the Sixth Circuit—have held that a failure to monitor claim does not survive absent a predicate breach of fiduciary duty by a monitored fiduciary"), *aff'd* 853 F.3d 855 (6th Cir. 2017).

---

[15] Plaintiff's allegations are distinguishable from the allegations in *Doll v. Energy, Inc.*, No. 25-00043-CV-W-SRB, 2025 U.S. Dist. LEXIS 271639 (M.D. Wo. Sept. 10, 2025), which Plaintiff cites in his first Notice of Supplemental Authority. There, the plaintiff also alleged that the American Century TDFs were an imprudent investment.  While the *Doll* Court found that the plaintiff stated a claim, that decision was based on facts not alleged here.  Specifically, the plan "engaged in a least five major Plan fiduciary process errors" that deviated from the Plan's IPSs.  The *Doll* Court concluded that "Plaintiffs' significant allegations of wrongdoing are sufficient to plead a breach of duty of prudence claim." *Id.* at *11–12.  It based this conclusion on the fact that "Plaintiffs here allege that American Century TDFs underperformed comparable TDFs *and* specific incidences where Defendants failed to evaluate and monitor the American Century TDFs in accordance with their guidelines." *Id.* at *11 (emphasis in original).

[16] The Court declines Plaintiff's request "that the Court permit the same limited discovery here if it concludes that Plaintiff has not met his pleading burden."  (Doc. no. 19, PageID #248.)  Plaintiff's requested discovery would be limited to "any Plan investment policy statements (IPSs) and Plan Committee minutes and materials discussing the American Century TDFs performance and decision to retain those TDFs during the Class Period."  (*Id.*)  Such discovery would be unnecessary as it would not change the fact that the American Century TDFs did not materially underperform.

**VII.     Conclusion**

For the reasons set forth herein, Defendants' Motion to Dismiss (Doc. No. 18) is GRANTED.

**IT IS SO ORDERED.**

                 *s/Pamela A. Barker*
                 PAMELA A. BARKER
Date:  March 26, 2026             U. S. DISTRICT JUDGE

**APPENDIX A**

| ONE-YEAR RETURN (CUMULATIVE) | | | | |
|---|---|---|---|---|
| | **1/1/2019 – 12/31/2019** | **1/1/2021 – 12/31/2021** | **1/1/2023 – 12/31/2023** | **1/1/2024 – 12/31-2024** |
| American Century Retirement 2030 Trust Class XI | 1.18%–3.08% | 0.48%–6.13% | 0.68%–4.00% | 0.07%–2.43% |
| American Century Retirement 2035 Trust Class XI | 2.39%–3.71% | 1.18%-6.43% | 1.30%-4.89% | 0.82%–3.69% |
| American Century Retirement 2040 Trust Class XI | 2.2%–3.32% | 2.1%–7.66% | 1.94%–5.36% | 1.50%–4.59% |
| American Century Retirement 2045 Trust Class XI | 1.45%–2.78% | 2.82%–7.45% | 2.25%–5.69% | 1.78%–4.09% |
| American Century Retirement 2050 Trust Class XI | 0.16%–1.75% | 2.32%–6.63% | 1.89%–5.35% | 1.35%–3.44% |
| American Century Retirement 2055 Trust Class XI | 0.09%–1.4% | 1.76%–6.35% | 1.3%–5.14% | 0.50%–2.83% |
| American Century Retirement 2060 Trust Class XI | 0.11%–1.25% | 1.17%–6.44% | 1.01%–4.89% | 0.64%–2.53% |
| American Century Retirement 2065 Trust Class XI | N/A | 0.89%–6.52% | 0.69%–4.97% | 0.43%–2.49% |

**APPENDIX B**

| THREE-YEAR RETURN (ANNUALIZED) | | | | |
|---|---|---|---|---|
| | 1/1/2017 – 12/31/2019 | 1/1/2019 – 12/31/2021 | 1/1/2021 – 12/31/2023 | 1/1/2022 – 12/31-2024 |
| American Century Retirement 2030 Trust Class XI | 1.13%–2.62% | 1.17%–3.32% | 0.35%–2.56% | 0.30%–1.55% |
| American Century Retirement 2035 Trust Class XI | 1.03%–3.03% | 1.18%–3.33% | 0.80%–2.93% | 1.03%–2.16% |
| American Century Retirement 2040 Trust Class XI | 0.38%–2.82% | 0.96%–3.42% | 0.88%–3.82% | 0.39%–2.77% |
| American Century Retirement 2045 Trust Class XI | 0.71%–2.34% | 0.24%–2.90% | 1.35%–3.88% | 0.91%–2.80% |
| American Century Retirement 2050 Trust Class XI | 0.18%–1.68% | 0.58%–1.77% | 1.24%–3.64% | 0.92%–2.67% |
| American Century Retirement 2055 Trust Class XI | 0.07%–1.77% | 0.25%–1.41% | 0.94%–3.41% | 0.56%–2.36% |
| American Century Retirement 2060 Trust Class XI | 0.12%–1.55% | 0.03%–1.18% | 0.70%–3.48% | 0.33%–2.32% |
| American Century Retirement 2065 Trust Class XI | N/A | N/A | 0.59%–3.68% | 0.14%–2.49% |

**APPENDIX C**

| FIVE-YEAR RETURN (ANNUALIZED) | | | | |
|---|---|---|---|---|
| | **1/1/2015 – 12/31/2019** | **1/1/2017 – 12/31/2021** | **1/1/2019 – 12/31/2023** | **1/1/2020 – 12/31-2024** |
| American Century Retirement 2030 Trust Class XI | 1.01%–1.98% | 1.07%–2.64% | 0.87%–2.31% | 0.69%–2.18% |
| American Century Retirement 2035 Trust Class XI | 1.13%–2.30% | 1.09%–3.21% | 0.19%–2.29% | 1.05%–2.31% |
| American Century Retirement 2040 Trust Class XI | 1.79%–2.16% | 1.22%–3.18% | 1.54%–2.39% | 1.50%–2.73% |
| American Century Retirement 2045 Trust Class XI | 0.67%–1.86% | 0.28%–2.60% | 0.36%–2.06% | 0.38%–2.40% |
| American Century Retirement 2050 Trust Class XI | 0.31%–1.62% | 0.56%–1.99% | 0.95%–1.37% | 0.71%–1.96% |
| American Century Retirement 2055 Trust Class XI | 0.12%–1.47% | 0.27%–1.69% | 0.61%–1.13% | 0.71%–1.74% |
| American Century Retirement 2060 Trust Class XI | N/A | 0.07%–1.40% | 0.54%–1.06% | 0.79%–1.69% |